## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **MELISSA EDWARDS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:18-CV-740-RDP** |
| | } | |
| **COMPASS BANK,** | } | |
| | } | |
| **Defendant.** | } | |
| | } | |

## MEMORANDUM OPINION

This is an employment discrimination case in which Plaintiff Melissa Edwards claims that Defendant Compass Bank[1] discriminated against her because of her race (Caucasian) and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1981. (Doc. # 14). Specifically, Plaintiff claims that Defendant failed to promote her because of her race and, after she filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), it retaliated against her by continuing to refuse to promote her, by disciplining her, and terminating her employment. (Doc. # 14).

The case is before the court on Defendant's Motion for Summary Judgment. (Doc. # 20). The Motion has been fully briefed (*see* Docs. # 21, 24, 26) and is ripe for review. After careful review, and for the reasons explained below, the court concludes that Defendant's Motion is due to be granted.

---

[1] Defendant was formerly known as Compass Bank d/b/a BBVA Compass. On June 10, 2019, it changed its name to BBVA USA.

# I.    Background[2]

In 2004, Plaintiff began her employment with Defendant as a "Talent Partner II" at a "salary grade"[3] of 18. (Doc. # 14 at 3, ¶ 12). Plaintiff started out working in the East Retail line of business. (Doc. # 22-1 at 16).[4] At that time, Linda McQueen was the Director of Talent and Culture Solutions for Defendant. (Doc. # 14 at 6, ¶ 31; Doc. # 22-17 at 3, ¶ 1). McQueen later asked Plaintiff to move to the Risk line of business, which Plaintiff preferred. (Doc. # 22-1 at 16). Thereafter, Plaintiff received high praise for her work with Risk: "[Plaintiff] is precise; she always returns [our] phone calls and emails; she is professional; she is knowledgeable . . . ; she appears to have good working relationships with other departments. Bottom line . . . we are very pleased with her involvement." (Doc. # 22-10 at 64).

In March 2016, McQueen was replaced as Director of Talent and Culture Solutions by Janel Taylor, a young, African-American female. (Doc. # 14 at 6, ¶ 31; Doc. # 22-17 at 3, ¶ 1). When Taylor took over the position, Plaintiff informed her that she was seeking a same-seat promotion.[5] (Doc. # 22-1 at 23). Same-seat promotions typically occur in the months of May and November. (Doc. # 22-12 at 17; Doc. # 22-17, at 3). Taylor denied Plaintiff's 2016 request for a

---

[2] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[3] A "salary grade" "contains a range of base salary applicable to the specific grade, and the higher the grade, the higher the range of salary is." (Doc. # 21 at 3, ¶ 6). However, "a salary grade increase does not necessarily correspond with a salary increase, as the salary ranges within the various grades overlap." (Doc. # 21 at 4, ¶ 7).

[4] Throughout this Opinion, the court cites to the court-filed page numbers of the deposition transcripts, not the page numbers of the transcript itself.

[5] A same-seat promotion "occurs when an employee moves up from one grade level in a job hierarchy to the next salary grade level within the same job hierarchy while remaining in the same Position Control Number. . . . Same seat promotions are considered/recommended when the department has a recognized need for the new level of responsibilities, accountability, and performance required of the higher level job." (Doc. # 21 at 5, ¶ 14; Doc. # 25-6 at 7).

same seat promotion because she had just assumed the job, she was still assessing the team, she was not familiar with the budget, and she had not had time to assess anyone's performance. (Doc. # 22-11 at 13; Doc. # 22-17 at 2-3, ¶¶ 2-7).

In June 2016, the Securities and Exchange Commission conducted a cyber-security audit of Defendant that uncovered the failure by employees to timely "key" (*i.e.*, input) employee terminations in Defendant's "NETprofile" system, which opened Defendant up to a security risk. (Doc. # 22-18 at ¶ 5; Doc. # 22-17 at ¶ 14). Those individuals continued to have access to the bank's confidential data, including customer data, following the termination of their employment. (*Id.*). Therefore, Taylor began emphasizing to Talent Partners the need to key in terminations as soon as possible. (Doc. # 22-17 at ¶ 14).

On or about November 3, 2016, Defendant posted a job for which Plaintiff applied. (Doc. # 22-1 at 24-25; Doc. 23-3 at 24). However, because the position was initially incorrectly posted, it was taken down and reposted. (Doc. # 22-3 at 24). Taylor informed Plaintiff that, to be considered for this position, she would need to reapply and interview for the position with her (Taylor) and a panel. (Doc. # 22-1 at 30-31). Not every candidate who applied for this position was interviewed. (Doc. # 25-8 at 14). As Taylor testified, "[i]f they were an HR candidate who possessed the minimum years of experience, there would have been an interview with me. And if they were passed -- if they got past that round with me, they would have done a panel interview with their peers, and then I would have chosen someone based on the panel interview." (Doc. # 25-8 at 14). Plaintiff points out that when employees received same seat promotions or changed lines of business, they were not required to interview. (Doc. # 22-1 at 31).

In 2016, Taylor promoted Tasha Hardy, a Caucasian female, to a grade 20 salary level

because the line of business Ms. Hardy was in -- mortgages -- was restructured.[6] (Doc. # 22-11 at 15; Doc. # 22-17 at 4, ¶ 11; Doc. # 25-8 at 7, 15). This move did not implicate incentives which would have impacted the budget. (Doc. # 22-17 at 4, ¶ 11).

On March 20, 2017, Defendant announced the creation of the U.S. Talent & Culture Project-Based Organization ("PBO"). (Doc. # 22-3 at 26-27). Adrianna Quevedo-Price became the manager of the PBO. (Doc. # 22-17 at 4, ¶ 8). Plaintiff and two other Talent and Culture employees, including Orazio Mancarella, were selected for the PBO. (Doc. # 22-3 at 26-27). Quevedo-Price and Rosilyn Houston, an African-American who is the Chief Talent and Culture Officer, were involved in making that decision. (Doc. # 22-1 at 17). David Keith served as the project manager for Plaintiff's first "long-term incentive program" in the PBO (*see id.*), and Quevedo-Price became Plaintiff's direct supervisor. (Doc. # 22-17 at 4, ¶ 8).

While Plaintiff was with the PBO, her pay grade stayed the same (18), and she received variable compensation, including bonuses and benefits. (Doc. # 22-1 at 20). This occurred even though an employee at pay grade 18 generally does not receive variable compensation. (*Id.*).

In or around May 2017, Adriana Quevedo-Price promoted[7] Orazio Mancarella, who worked in the PBO with Plaintiff, to a grade 20 salary level. (Doc. # 22-17 at 4, ¶ 10). Mancarella received this promotion because he was the "Scrum Master" (the leader who defined the methodology) for his project. (*Id.*).

---

[6] Taylor's deposition conflicts with her Declaration on the issue of what salary grade level Hardy was at when she was promoted. Taylor states in her deposition that Hardy was promoted from an 18 to a 20 due to the mortgage line of business being restructured. (Doc. # 22-11 at 15). However, in her Declaration, Taylor states that Hardy was promoted from a 16 to an 18 because every level 16 Talent Partner was being transferred to a different division. (Doc. # 22-17 at 4, ¶ 11). The court notes that regardless of the salary grade, the promotion went to a Caucasian employee.

[7] Plaintiff believes this was a same-seat promotion because Mancarella went from a Talent Partner II to a Talent Partner III. (Doc. # 22-1 at 22). However, Taylor testified that this was not a same-seat promotion because Mancarella was still serving in the PBO as Scrum Master, and further, she had no authority over his promotion. (Doc. # 22-17 at 4, ¶ 10).

In May 2017, a vacant Talent Partner position was posted. (Doc. # 22-17 at 5, ¶ 13). Candidates were required to apply for this position, which also required an interview. (*Id.*). Taylor promoted Brittany Hatcher, an African-American female, to this grade 20 position that had been previously held by Robyn Black. (Doc. # 22-11 at 15; Doc. # 22-17 at 5, ¶ 13). This was not a same-seat promotion, and Plaintiff did not apply for the position. (Doc. # 22-17 at 5, ¶ 13). Additionally, Plaintiff was ineligible for the position because it was in the engineering line of business, and Plaintiff did not work in that area. (Doc. # 25-8 at 15; Doc. # 22-17 at 5, ¶ 13).

On June 3, 2017, Plaintiff filed a charge of discrimination with the EEOC alleging race and age discrimination with respect to Plaintiff's consistent expressions of interest in "advancing her career with [Defendant]" by "repeatedly express[ing] a desire to be considered for promotion or same-seat promotion to a higher pay grade." (Doc. # 14-1 at 2). Specifically, Plaintiff asserted that the African-American candidates with less experience than she had received the promotions. (Doc. # 14-1 at 2).

In June 2017, a vacant grade 20 salary level position whose client base included corporate clients, such as the Legal and Compliance Departments, was posted. (Doc. # 22-17 at 4, ¶ 12). Candidates were required to apply for this position. (*Id.*). Tammy Fincher, an external African-American candidate was hired. (Doc. # 22-1 at 30; Doc. # 22-17 at 4, ¶ 12). Fincher had prior experience in human resources with corporate clients. (Doc. # 22-17 at 4, ¶ 12). Plaintiff did not apply for this position. (Doc. # 22-17 at 4, ¶ 12).

In approximately September 2017, Plaintiff was moved from the PBO back to East Retail. (Doc. # 25-10 at 35). On September 17, 2017, Taylor's employment with Defendant ended. (Doc. # 14 at 6, ¶ 31; Doc. # 25-8 at 11).

On November 7, 2017, Reba Simmons, an African-American hiring manager for

Defendant, selected Patricia Osborne, an African-American female, as the new Director of Talent and Culture Solutions. (Doc. # 14 at 6, ¶¶ 32-33). Before replacing Taylor, Osborne had been a Talent Partner who worked with Plaintiff in Human Resources. (Doc. # 25-6 at 4).

On or about November 15, 2017, Defendant posted Osborne's prior position. (Doc. # 14 at 7, ¶ 41; Doc. # 25-10 at 37). Plaintiff applied. (*Id*). At around this time, David Keith, a Caucasian male who had moved to PBO with Plaintiff, approached Simmons and asked to get back his job supporting retail and commercial. (Doc. # 25-10 at 37). On December 18, 2017, Simmons selected Keith to fill the position. (Doc. # 14 at 7, ¶¶ 41, 44-45; Doc. # 25-10 at 37-38). Simmons chose Keith because "Keith had done the job before, he was knowledgeable, [and] it made good sense to transition him back into the role." (Doc. # 25-10 at 38).

In January 2018, Plaintiff was promoted to salary grade 20 through a same-seat promotion. (Doc. # 22-10 at 6-7). Krista Pettus -- an African-American who was also at grade 18 salary level -- was also promoted to grade 20. (Doc. # 22-1 at 19; Doc.# 22-10 at 7; Doc. # 25-8 at 9). Osborne requested a same seat promotion for both Pettus and Plaintiff. (Doc. # 22-10 at 7). Plaintiff became the Talent & Culture Partner over the East region of the Retail line of business. (Doc. # 22-18 at 4, ¶ 9).

On January 22, 2018, Krista Pettus received an e-mail from Jennifer Polnett regarding an employee, Laurie Little, who was to be terminated from the system because she had been out on leave for 180 days. (Doc. # 22-5 at 30; Doc. # 22-6 at 8; Doc. # 22-1 at 47). Pettus replied to the e-mail and copied Plaintiff. (Doc. # 22-6 at 8). Pettus wrote "I have copied [Plaintiff] on this email now that she is the new partner. Melissa, I have notes in Felix." (Doc. # 22-6 at 8; Doc. # 22-18 at 4, ¶ 10). Polnett then e-mailed Plaintiff directly informing Plaintiff that "Laurie Little would have to be processed out of the system in netprofile. She reached [] 180 days being out on leave." (Doc.

22-6 at 10; 22-18 at 4, ¶ 11).

On February 13, 2018, Osborne e-mailed several Talent Partners, including Plaintiff, regarding untimely keying of terminations into Defendant's computer system, emphasizing that it was a "top priority." (Doc. # 21 at 10, ¶ 51; Doc. # 22-5 at 9).

On February 22, 2018, Plaintiff was notified that Ms. Little, the subject of the January 22, 2018 e-mail correspondence, had passed away. (Doc. # 22-5 at 30; Doc. # 22-18 at 4, ¶ 12).

On March 22, 2018, after Plaintiff was notified a second time that Ms. Little should have be terminated from the system, Plaintiff finally terminated Ms. Little from the system. (Doc. # 22-5 at 30; Doc. # 22-10 at 14-15; Doc. # 22-18 at 4, ¶ 13). However, because Plaintiff had not timely keyed Ms. Little's termination, "her beneficiaries were not sent the appropriate paperwork to properly convert her life insurance policy, [resulting] in a loss of life insurance benefits in the amount of $89,000." (Doc. # 22-5 at 30; Doc. # 22-10 at 14-15; Doc. # 22-18 at 4, ¶ 14). Defendant bore the $89,000 loss. (Doc. # 22-5 at 30; Doc. # 22-18 at 4, ¶ 14).

During 2018, Plaintiff was recognized for her good performance and kindness. On February 16, 2018, Plaintiff received a Special Thanks and Recognition ("STAR") award (which included a $3,000 payment). The award was initiated and approved by Osborne. (Doc. # 22-10 at 9; Doc. # 22-5 at 9). On April 11, 2018, Plaintiff received an Aspire card (a sort of "kudos") from another employee whom Plaintiff had helped through a challenging situation. (Doc. # 22-10 at 60-61; Doc. # 25-6 at 8).

On May 14, 2018, Plaintiff filed this lawsuit. (Doc. # 1). She continued her employment with Defendant after that filing.

On July 19, 2018, Osborne reached out to Plaintiff because Osborne was responding to an audit inquiry about Ms. Little's insurance benefits. (Doc. # 22-1 at 47). Osborne was required to

explain why Ms. Little's termination was not keyed in until March 2018, even though Defendant had been notified on February 22, 2018 that Little was deceased. (Doc. # 22-18 at ¶ 15). Osborne and Plaintiff met to discuss the matter. (Doc. # 22-5 at 28; Doc. # 22-18 at 5, ¶ 16). Osborne informed Plaintiff that legal counsel had been engaged to determine if there was any insurance coverage for the $89,000 loss. (*Id.*).

Osborne also reached out to Pettus regarding Little's situation. (Doc. # 22-10 at 15). Pettus supplied Osborne with the e-mail correspondence (on which Plaintiff was copied) regarding the situation. (Doc. # 22-10 at 15-16). Pettus confirmed that the Little matter had been passed on to Plaintiff in light of the change in their responsibilities. (Doc. # 22-18 at ¶ 18).

Thereafter, Osborne met with Reba Simmons about the appropriate discipline for Plaintiff. (Doc. # 22-18 at ¶¶ 19-20). In light of the financial loss, Osborne viewed only two options: a "probation exception to termination" or termination. (*Id.*). Simmons thought Plaintiff should be terminated. (*Id.*). Osborne recommended a "probation exception to termination" because she did not want to terminate Plaintiff. (*Id.*).

On August 1, 2018, Osborne issued Plaintiff a "Probation Exception to Termination" which placed Plaintiff on a 90-day probationary period. (Doc. # 22-18 at ¶ 21; Doc. # 22-5 at 30). The Memorandum notifying Plaintiff of her probation exception explains that "[t]he $89,000 loss is excessive and typically warrants termination of [] employment." (Doc. # 22-5 at 30). Plaintiff signed the Memorandum, but noted that she would "submit a statement of events [] by close of business." (*Id.*). On August 7, 2018, Plaintiff provided Osborne with various e-mail correspondence regarding Little's FMLA/LTD status. (Doc. # 22-6 at 3-24; Doc. # 22-5 at 30; Doc. # 22-1 at 47).

On August 9, 2018, Plaintiff received an e-mail from one of the managers to whom she

provided human resources support. The e-mail indicated that an employee, Alondra Espinosa, had given her two-weeks notice. (Doc. # 22-18 at 4, ¶ 14). Shortly afterward, Plaintiff received another e-mail informing her that Espinosa changed her mind and decided to quit immediately. (Doc. 22-1 at 59-60). That e-mail asked Plaintiff to "key in her resignation for today." (*Id.*).

Plaintiff testified that she thought that there was "no rush" to terminate Espinosa from the system and waited to get further information before processing the termination. (Doc. # 22-1 at 60). Plaintiff testified at her deposition that, at that time, she was not aware that employees were not removed from data access until their termination was keyed in the system. (*Id.*). Plaintiff did not key Espinosa's termination in the system until August 23, 2018. (*Id.*).

On August 22, 2018, Osborne was notified by the Data Security Department that Espinosa had not been terminated from the system. (Doc. # 22-18 at 6, ¶ 25; Doc. # 22-10 at 21-22). Osborne looked in the Felix system and determined that Plaintiff was the responsible Talent Partner and directed her to terminate Espinosa from the system. (Doc. # 22-10 at 22; Doc. # 22-18 at 6, ¶ 25).

Plaintiff was planning to terminate Espinosa on August 23, 2018, the end date of the original two-weeks' notice. (Doc. # 22-1 at 61). At 9:56 that morning, Plaintiff received an e-mail from Data Security asking why Espinosa's termination had not been entered. (Doc. # 22-10 at 22; Doc. # 22-1 at 61). By that time, Plaintiff had already entered Espinosa's termination. (Doc. # 22-1 at 61).

Osborne met with Plaintiff on August 23, 2018, to discuss why Espinosa's termination had not been keyed into the system in a timely manner. (Doc. # 22-18 at 6, ¶ 26; Doc. # 22-7 at 34-35). Osborne told Plaintiff that workload was not an excuse, but allowed Plaintiff an opportunity to explain why she had not terminated Espinosa earlier. (Doc. # 22-1 at 62; Doc. # 22-10 at 22; Doc. # 22-18 at 6, ¶ 26). At 4:53 p.m. on August 23, 2018, Plaintiff sent Osborne an e-mail stating:

You asked for a follow up email with my justification as to why the Alondra Espinosa resignation on 08/09/18 was not timely keyed.

You communicated that the work load is not an excuse that you could accept because you were doing the job of 3 people currently, at this time I do not feel any reason that I provide you would be acceptable.

Again, I want to communicate that I am not the only T&C employee what is guilty of this type of error or other administrative errors within T&C.

(Doc. # 22-7 at 32).

Simmons asked Osborne to terminate Plaintiff's employment because Plaintiff committed an offense similar to that for which she had just recently been placed on probation. (Doc. # 22-18 at 6, ¶ 27). On August 1, 2018, Plaintiff had been placed on Probation as an exception to termination for failing to terminate an employee in a timely fashion which resulted in an $89,000 loss to the bank. (Doc. # 22-10 at 99). At that time she was warned to "comply with the standards in place to terminate employees in a timely fashion." (*Id.*). Within nine (9) days of being placed on Probation, Plaintiff again failed to timely terminate an employee from the system. (Doc. # 22-18 at ¶¶ 23-27). Plaintiff was notified of her termination on August 30, 2018. (*Id,;* Doc. # 22-10 at 99).

On October 9, 2018, Plaintiff filed an Amended Complaint in this action. (Doc. # 14).

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has

met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be

granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.    Analysis

Plaintiff's Amended Complaint alleges she suffered race discrimination (Count One)[8], age discrimination (Count Two), and retaliation (Count Three). (Doc. # 14 at 10, 11, 13). However, in her response to Defendant's Motion for Summary Judgment, Plaintiff concedes that her claims of age discrimination and retaliation under the ADEA are due to be dismissed. (Doc. # 24 at 15 n.1). The court will address Plaintiff's remaining claims of race discrimination and retaliation under Title VII and § 1981.

---

[8] The court notes that, although Plaintiff's Amended Complaint contains only one race discrimination count, that count contains multiple claims for relief. (Doc. # 14 at 10-14). Under that one count, Plaintiff argues that Defendant discriminated against her in two ways: by failing to promote her, and by disciplining her more harshly than alleged comparators. (Doc. # 24 at 18-27). Although this constitutes a form of shotgun pleading, *Anderson v. Dist. Bd. of Trustees of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996) (where a plaintiff asserts multiple claims for relief, each claim for relief should be pled in a separate count, as required by Rule 10(b)), the court will address the claims separately.

## A.     Plaintiff's Race Discrimination Claims

Absent direct evidence of racial discrimination (of which there is none in the Rule 56 record), Title VII and Section 1981 disparate treatment claims[9] are evaluated according to the burden-shifting framework developed by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  *Bryant v. Jones,* 575 F.3d 1281, 1307 (11th Cir. 2009). Although the *prima facie* elements are flexible to accommodate the presentation of different types of claims in different contexts, generally a plaintiff meets his initial burden of establishing a *prima facie* case of race discrimination by presenting evidence that (1) he belongs to a racial minority, (2) he suffered an adverse job action, (3) his employer treated similarly situated employees outside of his classification in a more favorable manner, and (4) he was qualified for the job in question. *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)). If the plaintiff makes such a showing, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802; *Chapman v. AI Transp*., 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). This burden is one of production, not persuasion, and is "exceedingly light." *Turnes v. AmSouth Bank, N.A*., 36 F.3d 1057, 1061 (11th Cir. 1994); *Perryman v. Johnson Prod. Co.*, 698 F.2d 1138, 1141 (11th Cir. 1983). "If the employer satisfies its burden by articulating one or more reasons, then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." *Wilson v. B/E Aeorospace, Inc.,* 376 F.3d 1079, 1087 (11th Cir. 2004).

---

[9] Plaintiff's Title VII and § 1981 claims will be analyzed together because claims under those statutes "have the same requirements of proof and use the same analytical framework." *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir.1998).

### 1.    Timeliness of Plaintiff's Title VII Claims

Defendant argues that certain of Plaintiff's Title VII claims are untimely. (Doc. # 21 at 18).

Plaintiff responds that Defendant's failure to promote claim is timely because of the continuing

violation doctrine. (Doc. # 24 at 22).

The Eleventh Circuit has explained Title VII's timely administrative exhaustion

requirement as follows:

> [T]o file a claim for discrimination under Title VII, the plaintiff must first exhaust
> his administrative remedies, beginning with the filing of a charge of discrimination
> with the EEOC. *Wilkerson v. Grinnell Corp*., 270 F.3d 1314, 1317 (11th Cir. 2001).
> In a non-deferral state, such as Alabama, a plaintiff must file an employment
> discrimination charge with the EEOC within 180 days after the date of the alleged
> discrimination. 29 C.F.R. § 1626.7(a); *Hipp v. Liberty National Life Ins. Co*., 252
> F.3d 1208, 1214 n.2, 1220 (11th Cir. 2001). Failure to file a timely charge with the
> EEOC results in a bar of the claims contained in the untimely charge. *Alexander v.
> Fulton County, Ga*., 207 F.3d 1303, 1332 (11th Cir. 2000). The plaintiff has the
> burden of establishing that he filed a timely charge of discrimination. *See Jackson
> v. Seaboard Coast Line R.R. Co*., 678 F.2d 992, 1010 (11th Cir. 1982).

*Jordan v. City of Montgomery*, 283 F. App'x 766, 767 (11th Cir. 2008). "[D]iscrete discriminatory

acts are not actionable if time barred." *Id.* (quoting *National R.R. Passenger Corp. v. Morgan*, 536

U.S. 101, 113 [ ] (2002)). "The clock for the 180-day filing period starts when the discrete unlawful

practice takes place." *Id.* (citing *Ledbetter v. Goodyear Tire & Rubber Co*., 550 U.S. 618, 628

(2007)).

The limitations period may be extended when a discriminatory practice constitutes a

continuing violation. *Calloway v. Partners Nat. Health Plans*, 986 F.2d 446, 448 (11th Cir. 1993).

"The continuing violation doctrine permits a plaintiff to sue on an otherwise time-barred claim

where at least one other violation occurred within the statutory period." *Brooks v. CSX Transp.,

Inc.*, 555 F. App'x 878, 880 (11th Cir 2014) (citing *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d

1208, 1221 (11th Cir. 2001)). But, in *Nat'l R.R. Passenger Corp. v. Morgan*, the Supreme Court

clarified that Title VII precludes recovery under the continuing violation doctrine for discrete acts

of discrimination or retaliation that occurred outside the statutory limitations period. 536 U.S. 101, 105, 110–15 (2002). The Supreme Court explained that each discrete discriminatory act starts a new clock for filing an EEOC charge alleging that act; and time-barred acts are not actionable, even if they are related to acts alleged in a timely-filed charge. *Id*. at 113. Discrete acts include "termination, failure to promote, denial of transfer, or refusal to hire," each of which is easy to identify. *Id*. at 114; *see also Davis v. Coca–Cola Bottling Co. Consol*., 516 F.3d 955, 970, 972–978 (11th Cir. 2008) (concluding that employer's refusal to promote plaintiffs to vacant supervisory positions, denial of their requests for light work assignments, and alleged retaliation against them for filing EEOC charges constituted discrete acts).[10]

Plaintiff filed her EEOC Charge on June 3, 2017. (Doc. # 14-1). Therefore, the general rule is that any Title VII claim based on an alleged discriminatory action that occurred prior to December 5, 2016 is due to be dismissed as time-barred. The alleged discriminatory decisions that are time-barred under Title VII include: (1) Taylor's refusal to give Plaintiff a same-seat promotion in 2016 (Plaintiff requested a same-seat promotion in approximately March 2016, and such promotions typically occur in the months of May and November) (Doc. # 22-12 at 17; Doc. # 22-17, at 3); and (2) Taylor's decision in early 2016 to move Plaintiff from the Risk line of business back to Retail.

Regardless of the timeliness of Plaintiff's claims under Title VII regarding these events, her section 1981 claims regarding the same events are timely under that statute's four-year statute of limitations. *See Grimes v. Bd. of Regents of Univ. Sys. of Ga*, 650 F. App'x 647, 651 (11th Cir.

---

[10] In *Morgan*, the Supreme Court distinguished discrimination and retaliation claims based on a series of discrete acts from hostile-work-environment claims; the Court concluded that, where the plaintiff raises a hostile-work-environment claim, § 2000e–5(e)(1) permits recovery for acts that occurred outside the statutory limitations period, as long as at least one act contributing to the hostile work environment took place within the limitations period. *Morgan*, 536 U.S. at 115, 122. Plaintiff has not asserted a hostile environment claim. (Doc. # 14, 24).

2016) ("we apply a four-year statute of limitations to any § 1981 claim that is cognizable only because of the 1991 amendment and otherwise apply the analogous state statute of limitations.").

### 2. Plaintiff's Failure to Promote Claim

The method of presenting a prima facie case under the *McDonnell Douglas* burden-shifting framework is flexible. *Jefferson v. Burger King Corp.*, 505 F. App'x 830, 833 (11th Cir. 2013). Generally, though, "[i]n the failure-to-promote context, a plaintiff may demonstrate that [s]he is a member of a protected class and that [s]he was qualified and applied for the promotion but was rejected despite h[er] qualifications in favor of an equally or less qualified employee who was not a member of the protected class." *Jefferson*, 505 F. App'x at 833 (citing *Wilson*, 376 F.3d at 1089). "In some instances, a plaintiff [] may prevail by showing that the position for which [s]he applied remained open after the employer rejected h[er] despite h[er] qualifications." *Id.* (citing *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1267–68 (11th Cir. 1999)).

### a. Plaintiff Has Not Established A Prima Facie Case

Here, Defendant only contests whether Plaintiff has presented evidence satisfying the fourth prong of her prima facie case—*i.e.*, that Defendant treated "similarly situated" employees outside her protected class more favorably. (Doc. # 21 at 19).

Under *McDonnell Douglas*, the employees identified as comparators must be "similarly situated in all material respects." *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1226 (11th Cir. 2019). In *Lewis*, the Eleventh Circuit clarified this standard: A plaintiff must establish that the alleged comparator (1) "will have engaged in the same basic conduct (or misconduct) as the plaintiff;" (2) "will have been subject to the same employment policy, guidelines, or rule as the plaintiff;" (3) will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff;" and (4) "will share the plaintiff's employment or disciplinary history."

*Lewis*, 918 F.3d at 1227-28. "[A] valid comparison will turn not on formal labels, but rather on substantive likenesses. . . . [A] plaintiff and her comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Lewis*, 919 F.3d at 1228 (quoting *Young v. United Parcel Service, Inc.*, 135 S. Ct. 1338, 1355 (2015)). Under this standard, "[a]n employer is well within its rights to accord different treatment to employees who are differently situated in 'material respects'—*e.g.*, who engaged in different conduct, who were subject to different policies, or who have different work histories." *Lewis*, 919 F.3d at 1228.

Plaintiff identifies the following alleged comparators with regard to her failure-to-promote claim: Orazio Mancarella, Brittany Hatcher, Tammy Fincher, and Krista Pettus. (Doc. # 24 at 25-27). Defendant disagrees that any of these individuals qualify as appropriate comparators. (Doc. # 18-19).

Orazio Mancarella

In May 2017, while both he and Plaintiff were serving with the PBO, Mancarella received a promotion to a salary grade 20. (Doc. # 22-17 at 4, ¶ 10). Adriana Quevedo-Price made this decision. (*Id.*). Mancarella received the pay-grade promotion because he was the PBO Scrum Master of his project. (*Id.*). Plaintiff acknowledges that she was not a "Scrum Master" for a project while she was with the PBO. (Doc. # 24 at 26). Nonetheless, she argues that Mancarella is an appropriate comparator because she, too, "had extensive experience, including leadership roles." (*Id.*). The fact remains, however, that Mancarella performed a "Scrum Master" role and Plaintiff did not. This is a material difference under *Lewis*. *Lewis*, 919 F.3d at 1228 (a comparator must be sufficiently similar, in an objective sense, that they "cannot reasonably be distinguished."). Mancarella's "Scrum Master" duties reasonably distinguish him from Plaintiff.

<u>Brittany Hatcher</u>

In May 2017, Hatcher was promoted by Taylor to fill a vacant Talent Partner position. (Doc. # 22-11 at 15; Doc. # 22-17 at 5, ¶ 13). The position was posted for applications and required an interview process. (Doc. # 22-17 at 5, ¶ 13). It was also in the Engineering line of business. (*Id.*). Plaintiff did not apply for the position. (*Id.*). "A plaintiff claiming that [s]he was discriminatorily denied a promotion usually must show that [s]he actually applied for the position as part of h[er] prima facie case." *Taylor v. Austal, U.S.A., LLC*, 829 F. Supp. 2d 1162, 1177 (S.D. Ala. 2011)) (citing *Taylor v. Runyon*, 175 F.3d 861, 866 (11th Cir. 1999) and *Combs v. Plantation Patterns*, 106 F.3d 1519, 1539 n.11 (11th Cir. 1997)); *see also Harris v. Warehouse Servs., Inc.*, 77 F. Supp. 2d 1240, 1247 (M.D. Ala. 1999) ("The court cannot find, and Plaintiff offers no support for the proposition that a claimant need only 'express an interest' in a position in order to raise a failure to promote claim. To the contrary, Title VII clearly requires that a claimant apply for the position for which he was denied."). Moreover, although Plaintiff and Hatcher worked in the Human Resources Department, Hatcher supported engineering, whereas Plaintiff supported Retail. Under *Lewis*, a similarly-situated comparator generally will, among other things, "share the plaintiff's employment . . . history." 919 F.3d at 1228. Because Hatcher had experience supporting engineering and Plaintiff did not, and because Plaintiff did not apply for the position which Hatcher received, Hatcher is not an appropriate comparator.

<u>Tammy Fincher</u>

In June 2017, Fincher, an external candidate, applied for a vacant position supporting corporate clients such as the Legal and Compliance Department. (Doc. # 22-17 at 4, ¶ 12). The position was posted for applications. (*Id.*). Fincher applied for the position and had prior experience providing human resources services to corporate clients. (*Id.*). Plaintiff did not apply.

(*Id.*). Again, because Plaintiff and Fincher did not have the same experience and because Plaintiff did not apply for this position, Fincher is not an appropriate comparator. *See Lewis*, 919 F.3d at 1228.

<u>Kristin Pettus</u>

In January 2018, both Plaintiff and Pettus received same seat promotions to salary grade 20. (Doc. # 22-10 at 7). In fact, Osborne requested the same-seat promotions for Plaintiff, Pettus and another employee in the same January 3, 2018 e-mail. (*Id.*). Osborne requested approval for the promotions from Simmons and Houston, and they provided that approval. (Doc. # 22-10 at 6-7).Therefore, there is simply no disparate treatment between Plaintiff and Pettus in terms of salary grade and promotions.

<u>David Keith</u>

Keith is a white male who is older than Plaintiff. (Doc. # 22-1 at 40). Plaintiff has not made any argument that Keith is an appropriate comparator. (Doc. # 24 at 25-28). Rather, Plaintiff alleges that Defendant "made the decision to transfer Keith [to Osborne's previous position] rather than hire Plaintiff into [that] position." (Doc. # 14 at 8, ¶ 48). In her deposition, Simmons explained why she moved Keith into Osborne's previous position:

> So three of my team members went to the PBO, Melissa being one of them. Another guy by the name of Dave Keith was one of them. When Patricia moved into the Partner center, though, Dave came back and asked, can I have my old job back supporting retail and commercial. And he had done the job before he went to the PBO. And I told him, let me get the team to evaluate. So when we did our restructuring . . . Dave supported a management committee member who was responsible for commercial, and he was responsible for that whole group. We had combined -- well, Vickie [Vargas] had retail and wealth, whereas before, they were split out. So both of these are pretty -- two significant management committee members. This was our opportunity to split the job back out so that Vickie would just have the retail executive, and Dave would have the wealth executive. And it made sense because he had already been supporting that wealth executive and this was my opportunity to be able to support them in a much better way than I had been able to. Because the job was just really big for Vickie to handle that way. So when

Dave approached me about coming back to the PBO, he had done the role before –
I mean, from the PBO, he had done the role before, had been very successful in the
role before. I met with the team because I didn't want to go through the panel
interview process again. That was the team that he was going to be working with.
They were fine with him coming back to the team. I met with Melissa, specifically,
to let her know, basically, what I just shared with you. That they had done the work
before, it makes sense to pull him back, he'll be able to support the management
committee member again, and this just made good sense for us to put him back in
that role, and that's what I did.

(Doc. # 25-10 at 37-38). Keith had experience supporting a "management committee member,"

which Simmons indicated was a major factor in putting him into Osborne's previous position.

(*Id.*). Plaintiff did not have that experience. (Doc. # 25-10 at 38). Therefore, in addition to the fact

that Keith is Caucasian, Keith is not an appropriate comparator because he and Plaintiff were not

similarly situated in all material respects.

Plaintiff has not presented substantial evidence that an employee outside of her protected

group who was similarly situated to her in all material respects was treated more favorably that

she was. Therefore, Plaintiff has failed to establish prima facie case on her failure to promote

claim.

### b.    Plaintiff Has Not Established Pretext

Even if Plaintiff had established a prima facie case of race discrimination on her failure to

promote claim (which, to be clear, she has not), Defendant has articulated legitimate, non-

discriminatory reasons for each of its promotion decisions, as discussed above.

After an employer articulates one or more legitimate, nondiscriminatory reasons for the

employment action, a plaintiff must show that the proffered reason was a pretext for illegal

discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). If the proffered

reason is one that might motivate a reasonable employer, a plaintiff cannot simply recast the

reason, but must "meet that reason head on and rebut it." *Chapman*, 229 F.3d at 1030. "If the

plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding

whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Id*. at 1024-25. Further, a Title VII plaintiff "'cannot succeed by simply quarreling with the wisdom of that reason.'" *Kidd v. Mando Am. Corp*., 731 F.3d 1196, 1206 (11th Cir. 2013) (quoting C*hapman*, 229 F.3d at 1030). Indeed, "'a plaintiff cannot prove pretext by simply arguing or even by showing that [s]he was better qualified than the person who received the position [s]he coveted.'" *Kidd*, 731 F.3d at 1206 (quoting *Springer v. Convergys Customer Mgmt. Grp*., 509 F.3d 1344, 1349 (11th Cir. 2007) (per curiam) (internal brackets & quotation marks omitted)). "Our well-established circuit precedent prohibits us from deciding whom as between two candidates an employer *should* have hired." *Kidd*, 731 F.3d at 1206 (emphasis in original). Rather, the court "review[s] the qualifications of the selected candidate and plaintiff[] and determine[s] whether the difference between the two is of 'such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'" *Id.* at 1206 (quoting *Springer*, 509 F.3d at 1349).

Plaintiff makes four arguments in an attempt to show that Defendant's articulated reasons are pretextual: (1) the alleged comparators were less qualified than Plaintiff, (2) Defendant's reasons are subjective and masked discriminatory intent, (3) Defendant failed to follow its policies, and (4) Defendant's response to her EEOC charge is evidence of pretext. (Doc. # 24 at 30-31).

First, except for Plaintiff's subjective belief that she was more qualified than the alleged comparators, Plaintiff has not offered substantial evidence to show that Defendant's reasons for its promotion decisions were pretextual, much less "significantly probative" evidence of pretext. Second,

> [a] subjective reason can constitute a legally sufficient, legitimate, nondiscriminatory reason under the *McDonnell Douglas* /*Burdine* analysis. Indeed,

subjective evaluations of a job candidate are often critical to the decisionmaking process, and if anything, are becoming more so in our increasingly service-oriented economy.

*Chapman*, 229 F.3d at 1033; *see also Denney v. City of Albany*, 247 F.3d 1172, 1185 (11th Cir. 2001) ("Absent *evidence* that subjective hiring criteria were used as a mask for discrimination, the fact that an employer based a hiring or promotion decision on purely subjective criteria will rarely, if ever, prove pretext under Title VII or other federal employment discrimination statutes.") (emphasis added). Third, although a mere failure to follow policy does not always suggest discrimination, Plaintiff has not even identified which of Defendant's policies it allegedly failed to follow. (Doc. # 24 at 18). Finally, Plaintiff fails to identify how Defendant's response to her EEOC charge is evidence of pretext, other than to state that its rationale was subjective, which, as discussed above, is insufficient to show pretext.

Courts "do not review the wisdom or general fairness of [an employer's] decisions about who would be a better employee for the [position]." *Grovner v. Ga. Dep't of Natural Res.*, 646 F. App'x. 805, 811 (11th Cir. 2016). The record is devoid of any evidence showing that Defendant's stated reasons for its decision are untrue and that it had a discriminatory intent. Therefore, Plaintiff failed to establish that Defendant's given reasons are a pretext for race discrimination.

### 3.      Plaintiff's Probation/Termination Claim

Plaintiff argues that she was disciplined and her employment was ultimately terminated due to "late keying," while other, similarly-situated employees also "late keyed" but were not disciplined. (Doc. # 24 at 29). Specifically, Plaintiff argues that Krista Pettus was the employee responsible for keying Ms. Little's termination, and that Rashikia Washington and Jennifer Polnett, both African-Americans, also played a role in the failure. (Doc. # 24 at 12). The record does not support her contentions.

### a. Plaintiff Has Not Established A Prima Facie Case

To establish a prima facie case of discrimination in the disparate discipline context, a plaintiff must generally show (1) that she is a member of a protected class; (2) that she is qualified for her job; (3) she was subjected to an adverse employment action; and (4) that she was treated less favorably than similarly situated employees outside her protected class. *Lewis*, 918 F.3d at 1221. Assuming that Plaintiff satisfied the first three elements of the prima facie case here, her discrimination claim regarding her probation and termination fails because Plaintiff has not presented evidence that that she was treated differently than a similarly situated employees outside her protected class.

Plaintiff's argument that Pettus, Washington, and Polnett were responsible for not keying Little's termination is without merit. On January 22, 2018, Pettus received an e-mail from Polnett regarding an employee, Laurie Little, who was to be removed from the system because she had been out on leave for 180 days. (Doc. # 22-5 at 30; Doc. # 22-6 at 8; Doc. # 22-1 at 47). Pettus replied to the e-mail and copied Plaintiff. The was because Plaintiff was now the partner in charge of keying that termination. (Doc. # 22-6 at 8). Pettus wrote "I have copied [Plaintiff] on this email now that she is the new partner. Melissa [Plaintiff], I have notes in Felix." (Doc. # 22-6 at 8; Doc. # 22-18 at 4, ¶ 10). Polnett then e-mailed Plaintiff directly informing Plaintiff that "Laurie Little would have to be processed out of the system in netprofile. She reached [] 180 days being out on leave." (Doc. 22-6 at 10; 22-18 at 4, ¶ 11). The undisputed Rule 56 evidence establishes that it was Plaintiff's responsibility as the applicable Talent Partner.

Moreover, while other employees have been tardy in keying terminations (*see* Doc. # 25-6 at 12), there is no evidence in the record that any prior failure to timely key a termination caused so significant a financial loss as the Little incident. Indeed, Osborne testified that other employees

had engaged in late keying prior to the incident at issue, including Plaintiff, an employee by the name of Bonnie Franklin (a Caucasian female), and Melanie Sparks (a Caucasian female), and that no disciplinary action was ever taken. (Doc. # 25-6 at 10, 12). However, Plaintiff's failure to timely key Little's termination, even after Plaintiff was informed of her death, resulted in Defendant suffering an $89,000 monetary loss. Moreover, it came shortly after Plaintiff had been instructed to make keying timely terminations a "top priority." Under these circumstances, Plaintiff received a "probation exception to termination" for a period of ninety days. (Doc. # 25-6 at 86). Osborne noted that the loss "is excessive and typically warrants termination of . . . employment." (Doc. # 25-6 at 86). Thus, even though she cost her employer nearly $90,000, Plaintiff was disciplined, not terminated. Nevertheless, shortly after being placed on probation for this offense, Plaintiff failed to key in another employee's (Espinosa) termination in a timely manner because she thought there was "no rush" and was not aware that this raised a data security issue. (Doc. # 22-1 at 60).

This Rule 56 record does not contain substantial evidence that any other employee engaged in conduct which is even remotely similar in all material respects to Plaintiff's conduct. *Lewis*, 918 F.3d at 1229. Therefore, Plaintiff has failed to establish a prima facie case on her discriminatory probation and termination claim.

### b.    Plaintiff Has Not Established Pretext

As discussed above, once a defendant articulates a non-discriminatory reason for a challenged decision, "to avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted evidence is merely a pretext for discrimination." *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (internal quotations and citation omitted). That is, to show pretext, the plaintiff must demonstrate both that the employer's stated reason was false and that discrimination was the actual reason for the

decision. *Id.* Plaintiff has done nothing more than argue that someone else was responsible for failing to key Little's termination. This is insufficient to establish pretext.

Furthermore, with regard to the initial $89,000 error, Osborne told Simmons that she did not want Plaintiff to lose her job over this incident, and she wanted to "give [Plaintiff] a second chance." (Doc. # 25-6 at 19). Yet, having received that second chance, Plaintiff almost immediately squandered it by repeating the error. There is simply no substantial evidence in this Rule 56 record supporting the inference that Defendant's proffered reasons for Plaintiff's probation and termination are false and a pretext for race discrimination. *See Lee v. GTE Fla., Inc.,* 226 F.3d 1249, 1253 (11th Cir. 2000) ("[A] plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reasons, at least not where . . . the reason is one that might motivate a reasonable employer.").

## B.     Plaintiff's Retaliation Claims

The court begins its analysis of Plaintiff's Title VII retaliation claims by addressing whether Plaintiff has exhausted her administrative prerequisites.[11] After concluding she has done so, the court turns to the merits of Plaintiff's retaliation claims.

### 1.   Plaintiff Has Sufficiently Exhausted Her Administrative Prerequisites

"Prior to filing a Title VII action ... a plaintiff first must file a charge of discrimination with the EEOC." *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 466 (5th Cir. 1970). [12] Defendant

---

[11] "The purpose of this exhaustion requirement 'is that the [EEOC] should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts." *Gregory v. Ga. Dep't of Human Resources,* 355 F.3d 1277, 1280 (11th Cir. 2004) (citing *Evans v. U.S. Pipe & Foundry Co.,* 696 F.2d 925, 929 (11th Cir. 1983) and *Wu v. Thomas,* 863 F.2d 1543, 1548 (11th Cir. 1989) ("The purpose of the filing requirement is to insure that the settlement of grievances be first attempted through the office of the EEOC.")) (emphasis added).

[12] In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

argues that Plaintiff failed to exhaust her administrative remedies for her retaliation claims because she did not specify that she had suffered retaliation in her June 2017 EEOC charge. (Doc. # 21 at 20). However, in binding precedent the former Fifth Circuit held "that it is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge; the district court has ancillary jurisdiction to hear such a claim when it grows out of an administrative charge that is properly before the court." *Gupta v. E. Tex. State Univ.*, 654 F.2d 411, 413-14 (5th Cir. Unit A Aug. 1981); *see also Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 168-69 (11th Cir. 1988) (district court possessed jurisdiction over the retaliation claim because the retaliation claim "could reasonably be expected to grow out of the original charge of discrimination.").

The undersigned previously has applied *Gupta* and *Baker* to conclude that a plaintiff need not administratively exhaust his or her EEOC remedies before filing a retaliation claim growing out of an earlier-filed EEOC charge. *See Davis-Young v. Protective Life Corp.*, 2014 WL 4264845, at *7 (N.D. Ala. Aug. 21, 2014) (distinguishing the retaliation claim in *Gupta* from the retaliation claim presented); *Skotnicki v. Bd. of Trs. of Univ. of Ala.*, 2014 WL 3891973, at *13 (N.D. Ala. Aug. 8, 2014) ("When a retaliation claim is based on a retaliatory action taken against the employee *after* the initial EEOC charge is filed, the Eleventh Circuit has concluded that the retaliation claim necessarily grows out of a properly filed employment discrimination charge, and it is not necessary for a plaintiff to file a second charge specifically alleging retaliation."), *aff'd*, 631 F. App'x 896 (11th Cir. 2015).[13]

---

[13] Recently, in an unpublished opinion, the Eleventh Circuit distinguished *Gupta* and *Baker* and held that a plaintiff failed to exhaust his administrative remedies for a retaliatory termination claim arising from an EEOC charge. *Duble v. FedEx Ground Package Sys., Inc.*, 572 F. App'x 889, 892-93 (11th Cir. 2014). The plaintiff in *Duble* was terminated several months after filing his EEOC charge, but before he filed suit in federal court. *Id.* at 891. The panel in *Duble* explained that the *Baker* exception to exhaustion "does not apply[ ] when no other properly raised judicial claim exists to which the retaliation claim may attach." *Id.* at 892-93. It then distinguished the *Duble* plaintiff's retaliation claims from those presented in *Gupta* and *Baker* because the termination occurred while Plaintiff's EEOC

Because Plaintiff's retaliation claims grow out of her June 2017 EEOC charge, and the race discrimination claim based on that charge is properly before the court, Plaintiff's retaliation claim is also properly before the court. *Baker*, 856 F.2d at 168-69; *Gupta*, 654 F.2d at 413-14. Moreover, "[u]nlike Title VII ... § 1981 does not require that a plaintiff exhaust administrative remedies before bringing suit in federal court. *See Caldwell v. Nat'l Brewing Co.*, 443 F.2d 1044, 1046 (5th Cir. 1971) (holding that a plaintiff alleging discriminatory employment practices with regard to race 'has an independent remedy under § 1981 without respect to exhaustion under Title VII')." Therefore, the court will be addressing the claim under § 1981 in any event.

### 2.       Plaintiff Has Not Established A Prima Facie Case

Title VII bars an employer from retaliating against an employee who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). To establish a *McDonnell Douglas* prima facie case of Title VII or § 1981 retaliation, a plaintiff must show that "(1) [s]he engaged in statutorily protected expression, (2) the employer took action that would have been materially adverse to a reasonable employee, and (3) there was some causal relation between the two events." *Worley v. City of Lilburn*, 408 F. App'x 248, 250 (11th Cir. 2011) (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)).

Defendant focuses its arguments on the third element (Doc. # 21 at 21-23), which requires Plaintiff to show that the employment action challenged was causally related to protected conduct, "according to traditional principles of but-for causation." *Univ. of Texas Sw. Med. Ctr. v. Nassar*,

---

charge was pending. *Id.* at 893. At least two district courts in the Eleventh Circuit have applied *Duble*'s nonprecedential exhaustion ruling to find that plaintiffs failed to exhaust their administrative remedies for retaliation claims premised on post-charge retaliation. *See Jones v. Heritage-Crystal Clean, LLC*, 2016 WL 3406514, at *3-4 (M.D. Fla. June 21, 2016); *Robinson v. Koch Foods of Ala.*, 2014 WL 4472611, at *2 (M.D. Ala. Sept. 11, 2014). But, under the prior panel precedent rule, this court applies *Gupta* and *Baker*.

570 U.S. 338, 360 (2013). That is, a Plaintiff must establish that her "protected activity was a but-for cause of the alleged adverse action by the employer" *Id.* at 362. The but-for standard "is more demanding than the motivating-factor standard" that applies in Title VII discrimination claims. *Nassar*, 570 U.S. at 362

Plaintiff argues that Defendant retaliated against her when it denied her Osborne's former position which went to David Keith, and by disciplining and terminating her for failing to key a termination in a timely manner. (Doc. # 24 at 33-34). But in doing so, Plaintiff devotes scant attention to the element of causation. (*Id.*). In fact, as to Osborne's former position, she merely argues that Simmons (who awarded Keith the position) was aware of her EEOC charge at the time she made that decision because she had helped prepare Defendant's EEOC charge. (Doc. # 24 at 33). As to the keying violations, Plaintiff merely asserts that she as the first Talent and Culture employee to be disciplined for that type of conduct and blamed her for the resulting financial loss. (Doc. # 24 at 33-34).

Plaintiff filed her EEOC charge on June 3, 2017. (Doc. # 14-1 at 2). Osborne's position was awarded to Keith on December 18, 2017. (Doc. # 25-10 at 37-38). Plaintiff did not key Little's termination between January 18, 2018 and March 22, 2018, despite the February 2018 e-mail instructing employees to make keying a termination a "top priority.' (Doc. # 21 at 10, ¶ 51; Doc. # 22-5 at 9). (Doc. # 22-18 at ¶¶ 9-14). Plaintiff filed this lawsuit on May 14, 2018. (Doc. # 1). On July 19, 2018, in response to an audit, Osborne met with Plaintiff to discuss the Little matter and the $89,000 loss. (Doc. # 22-5 at 28, Doc. # 22-18 at ¶ 16). On August 1, 2018, Plaintiff was placed on a 90-day probation. (Doc. # # 22-18 at ¶ 21; Doc. # 22-5 at 30). Between August 9 and August 22, 2018, she again failed to timely key an employee termination. (Doc. # 22-1 at 59-60). Plaintiff was terminated on August 30, 2018. (Doc. # 21-10 at 99; Doc. # 22-18 at ¶¶ 23-27).

"A plaintiff may satisfy her burden of proving causation by demonstrating a 'close temporal proximity between the statutorily protected activity and the adverse employment action.'" *Luke v. Bd. of Trustees Fla. A&M Univ.*, 674 F. App'x 847, 851 (11th Cir. 2016) (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)). "But mere temporal proximity, without more, must be 'very close.'" *Luke*, 674 F. App'x at 851 (quoting *Thomas.*, 506 F.3d at 1364). While close temporal proximity can be effective to raise an inference of causation, if that is the only basis for causation, "the actions must be very close in time." *United States ex rel. Salters v. American Family Care, Inc.*, 2016 WL 7242180 at *6 (N.D. Ala. Dec. 15, 2016) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). A lapse in time of several months, in the absence of other evidence tending to show causation, is insufficient. *See Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004); s*ee also*, *Thomas*, 506 F.3d at 1364 (three-month interval between the statutorily protected activity and the adverse employment action is insufficient to establish a causal connection"); *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) ("a three and one-half month proximity between a protected activity and an adverse employment action is insufficient to create a jury issue on causation."); *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) ("If there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law.").

The only evidence relating to causation presented in this Rule 56 record is timing. And, under the cases set forth above, that evidence is insufficient to establish this element of Plaintiff's prima facie case. There was a six month time period between the filing of Plaintiff's EOCC charge and Keith being awarded Osborne's former position which is not sufficiently close in time.

There is a shorter time period between Plaintiff filing her lawsuit and her termination.

Osborne became aware of Plaintiff's EEOC charge when this lawsuit was filed in May 2018. (Doc. # 25-6 at 28). But two months later when deciding how to discipline Plaintiff for the Little matter, Osborne opted to give Plaintiff a second chance, which she shortly thereafter squandered. This evidence is insufficient to establish the causation element of Plaintiff's retaliation claim. Because Plaintiff has not presented evidence showing that her protected conduct was the but-for reason she did not receive a promotion or was terminated, she has failed to establish a prima facie case of retaliation.

### 3. Plaintiff Has Not Established Pretext

Even assuming that Plaintiff had established a prima facie case on her retaliation claims (which she has not), for the same reasons she was unable to establish pretext on her discrimination claims, she is unable to establish that Defendant's reasons for awarding Keith the promotion and for her termination were a pretext for retaliation. There is simply no substantial evidence in this Rule 56 record supporting the inference that Defendant's proffered reasons its employment decisions are a pretext for retaliation. *See Lee,* 226 F.3d at 1253 ("[A] plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reasons, at least not where . . . the reason is one that might motivate a reasonable employer."). Because Plaintiff has not met Defendant's reasons head on and rebutted them, *Chapman*, 229 F.3d at 1030, Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

### C. There is No "Convincing Mosaic" of Discrimination or Retaliation

Even though she has failed to establish a prima facie case of discrimination or retaliation under the *McDonnell Douglas* framework, Plaintiff's claims can proceed if she has otherwise presented "a convincing mosaic of circumstantial evidence that would allow a jury to infer

intentional discrimination" or retaliation. *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019) (considering plaintiff's claims following earlier en banc decision) (quoting *Smith*, 644 F.3d at 1328). Evidence showing such a mosaic may include "(1) 'suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees; and (3) that the employer's justification is pretextual." *Id.* (quoting *Silverman v. Bd. Of Educ. of City of Chicago*, 637 F.3d 729, 733–34 (7th Cir. 2011)). However, Plaintiff has not addressed this alternative means of showing discrimination or retaliation. Moreover, for the same reasons that Plaintiff has failed to show that Defendant's reasons for the challenged decision are pretextual, the court further finds that she has failed to present a "convincing mosaic" sufficient to withstand summary judgment. The court is not authorized to second-guess the business judgment of an employer. *See Beckles v. Fed. Express Corp.*, 489 F. App'x 380, 384 (11th Cir. 2012) ("We do not sit as a super-personnel department, and we do not review the wisdom of an employer's business decisions, no matter how mistaken, as long as the action was not for a prohibited discriminatory reason." (citing *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1266-67 (11th Cir. 2010) "Unless something links the [challenged] actions to the employee's race [or protected conduct], that a decisionmaker singles an employee out does not permit a jury to infer intentional discrimination based on race." *Burch v. Coca-Cola Bottling Co. United, Inc.*, 51 F. Supp. 3d 1176, 1194 (N.D. Ala. 2014). (quoting *Turner v. Fla. Prepaid College Bd.*, 522 F. App'x 829, 833 (11th Cir. 2013))).

With regard to Plaintiff's probation and termination, an employment decision motivated by particular, improper conduct on the part of an employee is not grounds for a claim of race discrimination or retaliation. *See Beckles*, 489 F. App'x at 384-85 (holding that if the defendant

employer's decision to terminate the plaintiff employee was based on a mere allegation that the plaintiff committed fraud, while that decision might be "rash and unwise," it would not be prohibited by Title VII). Here, Plaintiff failed to timely key an employee termination shortly after being reminded by Defendant of the importance of timely keying employee terminations. Her failure cost Defendant $89,000. She was placed on probation for this rule violation. And, shortly after being placed on probation, she again failed to timely key a second termination. Despite the February 13, 2017 e-mail about making keying terminations in a timely manner a top priority, and despite being placed on probation for previously failing to comply with that directive, Plaintiff testified that she thought that there was "no rush." (Doc. # 22-1 at 60). Based on this Rule 56 record evidence, the court cannot find that there is a jury issue concerning a convincing mosaic that Defendant was motivated either by racial animus or by an intent to retaliate against Plaintiff.

## IV.     Conclusion

For all of the reasons discussed above, Defendant's Motion for Summary Judgment is due to be granted. A separate order will be entered.

**DONE** and **ORDERED** this December 9, 2019.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE